UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

RENO TECHNOLOGY CENTER 1, LLC.,

    Plaintiff,

v.

NEW CINGULAR WIRELESS PCS LLC,

    Defendant.

Case No. 3:17-cv-00410-LRH-WGC

ORDER

Plaintiff Reno Technology Center 1, LLC ("RTC") has filed a motion for summary judgment (ECF No 29) on two of its claims against defendant New Cingular Wireless PCS LLC, ("AT&T").[1] AT&T responded and separately filed its own motion for summary judgment (ECF NO. 28) on all five of RTC's claims. RTC has also sought leave to file a sur-reply in opposition to AT&T's motion for summary judgment. (ECF No. 36). For the reasons stated below, the Court will grant RTC's motion to file a sur-reply, deny RTC's motion for summary judgment, and deny AT&T's motion for summary judgment in part and grant it in part.

**I. Factual Background and Procedural History**

This dispute centers around a 1997 agreement for the lease of a 200 square foot portion of a rooftop on a commercial building in Reno, Nevada. (ECF No. 29 at 4). AT&T's predecessor in interest entered into the lease to operate a communications facility that allowed for construction

---

[1] Neither RTC nor AT&T were original parties to the contract at issue in this case. Since the contract was signed in 1997, there have been several assignments on both the lessor side (RTC) and the lessee side (AT&T). Unless otherwise noted, the Court will refer to the various assignors as RTC and AT&T for clarity.

1

and maintenance of related facilities, towers, antennas, and buildings. (ECF No. 28 at 3; ECF No. 29 at 4). In December 2000, RTC acquired ownership of the building and became AT&T's landlord under the lease. (ECF No. 29 at 4). Neither party disputes that one of the material terms of the contract was that AT&T was required to install its own power meter and pay the utilities company directly for any electricity it used. (ECF No. 28 at 3–4; ECF No. 29 at 5). This is opposed to installing a sub-meter connected to the landlord's meter, which draws electricity through the landlord's meter. (ECF No. 29 at 5).

AT&T concedes that it never properly installed a separate power meter. "Sometime before 2000," AT&T hired an independent contractor to install a separate meter to power its communications equipment. (ECF No. 28 at 5). Although a meter was installed, the contractor "wired it directly to [RTC's] meter and did not put a submeter in." (*Id*.) This meant that AT&T was powering its communications equipment with RTC's electricity. In August 2000, RTC's predecessor in interest learned that AT&T had not properly installed the meter, but the two parties came to an agreement wherein AT&T would pay the predecessor in interest for its power usage based on an average daily consumption rate. (*Id*.) RTC assumed control of the lease in March 2001 after the predecessor in interest defaulted and became AT&T's direct lessor. (*Id*. at 6). AT&T asked Robert C. Rothe, the principal of the management company that owns the building in question, if it could continue with the daily consumption rate payment agreement. (*Id*. at 6). RTC has alleged that shortly after assuming control over the lease, Rothe told an unknown AT&T representative over the phone that RTC wanted AT&T to abide by the original terms of the lease – i.e. AT&T installing its own power meter. (ECF No. 31 at 6). During the same phone call, AT&T purportedly agreed to install its own meter. (*Id*.) AT&T disputes that this conversation ever took place. (ECF No. 28 at 6).

During the term of the lease, RTC alleges that it took "reasonable steps" to assure AT&T's compliance with the lease. Rothe stated that he visited the building's utility room several times over the years following the phone call, and when he did, he observed a power meter labeled "AT&T" which, in his opinion, appeared to be "separate, functional, and activated." (ECF No. 31 at 7). RTC also asserts that Rothe "regularly" reviewed RTC's monthly utility bills, but never saw

"anything indicating a problem in the bills or requiring further investigation." (*Id.*) RTC eventually discovered AT&T's breach in April 2015, when an electrician assessing unrelated tenants' electricity usage noticed that AT&T's meter was connected directly to RTC's meter. (*Id.* at 8). According to RTC, although AT&T had indeed installed a meter, it was an "inactive, nonoperational submeter." (ECF No. 29 at 6). Rothe was reportedly "shocked" to discover that AT&T had not abided by the terms of the lease. (ECF No. 31 at 9).

In its complaint, RTC argues that AT&T "concealed" the fact that it was tapping into its power. (ECF No. 1-1 at 9). In its response to AT&T's motion for summary judgment, RTC explains its theory behind how AT&T allegedly concealed its non-compliance with the lease agreement. It states that AT&T uses an online-based payment system run by a second-party vendor, CASS, for the payment of utility charges it incurs at leased commercial properties. (ECF No. 31 at 7). Under the system, AT&T's utility bills are sent directly to its account with CASS, where it can review the bills and pay them. (*Id.*) RTC did not have access to AT&T's CASS account, so it was unable to see if AT&T was being charged directly for its electricity usage at RTC's building. (*Id.* at 7–8). Moreover, RTC has alleged that AT&T was drawing power from the circuit that served the building's parking lot lights, making it "impossible [for RTC] to notice the usage from review of the utility bills." (*Id.* at 7). This is because the parking lot lights generate consistent power consumption regardless of tenant vacancies in the building. (*Id.* at 9).

Following the discovery of AT&T's non-operational power meter, RTC asserts that it took immediate action to discern the extent of AT&T's electrical usage. Rothe instructed an electrician to install a device that monitors electrical usage onto AT&T's powerline. (ECF No. 31 at 9). The collected data revealed that AT&T's power usage accounted for roughly four to five percent of RTC's total monthly utility charges for the property. (*Id.*) After collecting data for twelve months, RTC contacted AT&T in September 2016 to inform it that it had not been abiding by the terms of the lease agreement. (*Id.* at 10). A September 15, 2016 email between AT&T employees confirmed that there was no record in CASS of AT&T ever making utility payments to a utilities company for its energy usage at the lease site. (ECF No. 31-19 at 2). In April 2017, AT&T paid RTC for its utilities usage from August 2015 to March 2017. (ECF No. 31 at 10). The following month, AT&T

installed a working, separate power meter to its communications equipment, and since then, it has been paying the utility company directly for power. (*Id.*)

RTC has requested that AT&T pay it for its utilities usage from April 2001 to July 2015 and April 2017 to June 2017; RTC has calculated the damages at $146,644.46 for the missed payments and $156,441.81 in interest. (ECF No. 31 at 11). RTC also seeks attorney's fees and court costs pursuant to a provision in the lease agreement. (*Id.*) RTC filed its complaint in state court in June 2017, and AT&T timely removed the action to this Court in July 2017. (ECF No. 1). The Court is now faced with RTC's motion for partial summary judgment (ECF No. 29) and AT&T's motion for summary judgment (ECF No. 28).

## II. Legal Standard

Summary judgment is appropriate only when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show "that there is no genuine issue as to any material fact and that the [moving party] is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In assessing a motion for summary judgment, the evidence, together with all inferences that can reasonably be drawn therefrom, must be read in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Cnty of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1154 (9th Cir. 2001). The moving party bears the burden of informing the court of the basis for its motion, along with evidence showing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). On those issues for which it bears the burden of proof, the moving party must make a showing that is "sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986).

To successfully rebut a motion for summary judgment, the non-moving party must point to facts supported by the record which demonstrate a genuine issue of material fact. *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736 (9th Cir. 2000). A "material fact" is a fact "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where reasonable minds could differ on the material facts at issue, summary

4

judgment is not appropriate. *See v. Durang*, 711 F.2d 141, 143 (9th Cir. 1983). A dispute regarding a material fact is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Liberty Lobby*, 477 U.S. at 248. The mere existence of a scintilla of evidence in support of the non-moving party's position is insufficient to establish a genuine dispute; there must be evidence on which the jury could reasonably find for the non-moving party. *See id.* at 252.

Where, as here, the parties filed cross-motions for summary judgment on the same claims, the court must consider each party's motion separately and on its own merits, "giving the non-moving party in each instance the benefit of all reasonable inferences." *A.C.L.U. of Nev. v. City of Las Vegas*, 466 F.3d 784, 790-91 (9th Cir. 2006). Further, in evaluating the motions, "the court must consider each party's evidence, regardless under which motion the evidence is offered." *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532 (9th Cir. 2011). *See also Fair Hous. Council of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132, 1134 (9th Cir. 2001) ("[T]he court must consider the appropriate evidentiary material identified and submitted in support of both motions, and opposition to both motions, before ruling on each of them.").

### III. Discussion

RTC's motion requests summary judgment on two of its claims – breach of contract under Nevada law and breach of the implied covenant of good faith and fair dealing. (ECF No. 29 at 3). AT&T, on the other hand, requests summary judgment on all RTC's claims. It argues that RTC's first two claims and its third (quantum meruit) are barred by Nevada's six-year statute of limitations. (ECF No. 28 at 2). It further argues that RTC's fourth claim (conversion) is barred by Nevada's three-year statute of limitations, and that its fifth claim (fraudulent concealment) is not supported by any evidence in the record. (*Id.*) Because the resolution of RTC's claims turns on whether they are barred by the statute of limitations, the Court will examine AT&T's motion for summary judgment first. But before the Court reaches the merits of the parties' motions, it will first determine whether RTC should be allowed to file a sur-reply.

///

///

### A. RTC's Motion for Leave to File a Sur-Reply

RTC requests permission to file a sur-reply to address AT&T's citation (in its reply in support of its motion for summary judgment) to a Nevada Supreme Court case, *Riff v. Kowal*, 352 P.2d 819 (Nev. 1960), which it argues is not applicable in this case.[2] Under Local Rule 7-2(b), parties wishing to file a sur-reply must first seek leave of the Court, and the rule states that the motions themselves are discouraged. This reflects the Court's reticent attitude towards sur-replies, as "they usually are a strategic effort by the non-movant to have the last word on a matter." *Beckett v. Brinx Resources, Ltd.*, 2013 WL 6058487, at *1 (D. Nev. Nov. 14, 2013) (quoting *Avery v. Barsky*, 2013 WL 1663612, at *2 (D. Nev. Apr. 17, 2013)). But on the other hand, it is improper for a movant to raise arguments in its reply that it did not raise in its original motion because it does not afford the non-movant the opportunity to fairly respond. *Carstarphen v. Miller*, 594 F. Supp.2d 1201, 1204, n. 1 (D. Nev. 2009). When the Court does permit a sur-reply, the non-movant may only address matters raised in a reply to which it would otherwise be unable to respond. *Beckett*, 2013 WL 6058487 at *1 (citing *Kanvick v. City of Reno*, 2008 WL 873085, at *1, n.1 (D. Nev. Mar. 27, 2008)).

The Court will allow RTC to file its sur-reply. In its response to AT&T's motion for summary judgment, RTC argued that Nevada Revised Statute 11.200 tolled the statute of limitations for its breach of contract action because that statute "treats any payment upon an existing contract as an acknowledgement of the debt." (ECF No. 31 at 11). In response, AT&T cited the *Riff* case for the proposition that a partial payment on a contract under NRS 11.200 does not revive a claim that has already expired under the statute of limitations. (ECF No. 34 at 6). The focus of RTC's sur-reply is to dispel any notion that *Riff* is applicable to the instant case. Because AT&T did not object to RTC's motion, the Court will grant RTC's motion to file a sur-reply. *See* Local Rule 7-2(d) (the failure of an opposing party to respond to a motion constitutes a consent to the granting of the motion).

///

///

---

[2] AT&T did not file a response to RTC's motion for leave to file a sur-reply.

**B. AT&T's Motion for Summary Judgment**

1. Claim One – Breach of Contract

Turning to the merits of the motions, AT&T first argues that RTC's claim for breach of the lease agreement is time-barred and subject to summary judgment because the statute of limitations has run. Nevada law provides that breach of contract actions have a six-year statute of limitations period. NEV. REV. STAT. §11.190. AT&T states that it is "undisputed" that RTC knew that AT&T was in breach of the lease agreement no later than March 2001 because that was when Rothe allegedly told the unknown AT&T representative that he wanted AT&T to abide by the terms of the lease agreement. (ECF No. 28 at 8). It is at this point, AT&T argues, that RTC had actual knowledge of AT&T's material breach, and therefore, RTC cannot avail itself of the discovery rule to toll the statute of limitations. (*Id.* at 10). AT&T also argues that there was no tolling of the statute of limitations because pursuant to NRS §11.390, the alleged oral promise to install a separate power meter was not reduced to writing. (*Id.* at 9). In response, RTC asserts that the statute of limitations actually has been tolled because it gave AT&T an opportunity in March 2001 to cure its violations and Rothe's inspections of the utility room revealed nothing out of the ordinary. (ECF No. 31 at 19). Regarding AT&T's §11.390 argument, RTC asserts that it is misplaced because the lease agreement is governed under NRS §11.200 rather than §11.390.

In determining whether a statute of limitations has run against an action, the time must be computed from the day the cause of action accrued. *Clark v. Robison*, 944 P.2d 788, 789 (Nev. 1997). For breach of contract actions, a claim accrues as soon as "the plaintiff *knows or should know* of facts constituting the breach." *Bemis v. Estate of Bemis*, 967 P.2d 437, 440 (Nev. 1998) (emphasis in original). This rule, which has been widely adopted, is known as the discovery rule. In a discovery-based cause of action such as a breach of contract, a plaintiff must use due diligence in determining the existence of a cause of action. *Id.* (citing *Sierra Pacific Power Co. v. Nye*, 389 P.2d 387 (Nev. 1964)). When the plaintiff knew or should have known of the facts constituting the elements of its cause of action is generally a question of fact for the trier of fact. *Soper By and Through Soper v. Means*, 903 P.2d 222, 224 (Nev. 1995). The cause of action will be tolled until the point where the plaintiff had actual or constructive knowledge of the defendant's breach.

*Petersen v. Bruen*, 792 P.2d 18, 20 (Nev. 1990). Dismissal based on a statute of limitations defense is only appropriate "when uncontroverted evidence irrefutably demonstrates plaintiff discovered or should have discovered the facts giving rise to the cause of action." *Bemis*, 967 P.2d at 440 (citing *Nevada Power Co. v. Monsanto Co.*, 955 F.2d 1304, 1307 (9th Cir. 1992)).

As to the parties' §11.200 and §11.390 arguments, the Court finds that both parties are mistaken. RTC interprets §11.200 as meaning that because AT&T continued to pay rent under the lease agreement, its breach of contract action premised on the failure to install a working power meter was repeatedly tolled until it discovered the breach in April 2015. (ECF No. 31 at 11). This is a faulty reading of the statute and the defining caselaw. In full, §11.200 states that:

> The time in NRS 11.190 shall be deemed to date from the last transaction or the last item charged or last credit given; and whenever any payment on principal or interest has been or shall be made upon an existing contract, whether it be a bill of exchange, promissory note or other evidence of indebtedness if such payment be made after the same shall have become due, the limitation shall commence from the time the last payment was made.

NEV. REV. STAT. §11.200. RTC argues that §11.200 "treats any payment upon an existing contract as an acknowledgement of debt that tolls the applicable statute(s) of limitations until the time when the last payment was made." (ECF No. 31 at 11). While that statement is correct, §11.200 is inapplicable in this case. At no time during the lease agreement did AT&T ever owe RTC a contractual debt; indeed, there is no dispute that aside from its failure to install a separate power meter, AT&T followed the terms of the contract and made timely rent payments to RTC. The cases that RTC cites in support of its position involve a repayment of a loan where the debtor defaulted *and* the breach of contract action was premised on the loan default. *See, e.g., Hanchett v. Blair*, 100 F.817, 818 (9th Cir. 1900) (cause of action premised on the failure of a debtor to make repayments on his mortgage); *Miller v. York*, 548 P.2d 941, 945 (Nev. 1976) (failure to repay a promissory note). Moreover, these cases and several others interpreting §11.200 that the Court has reviewed involve installment payments on a debt (usually a mortgage or promissory note), which is not the case here. *See, e.g., First Commerce, LLC v. Sheck Gaming, Inc.*, 2017 WL 3013252 (D. Nev. July 13, 2017) (defendant rented restaurant equipment for 61 months and made installment payments); *Rocky Mountain Powder Co. v. Hamlin*, 310 P.2d 404 (Nev. 1957) (petitioner failed to

make all repayments on a promissory note). Here, RTC's breach of contract claim is premised on AT&T's failure to install its own power meter, not its failure to make a rent payment or other manner of repayment on a debt. RTC cannot bootstrap a breach of contract claim premised on a potentially time-barred breached contractual provision to a non-breached contractual provision to avoid the statute of limitations.

But even if the Court were to construe AT&T's failure to install a working power meter as a "debt," RTC's theory would still fall short. RTC correctly states that many jurisdictions, including Nevada, "apply the general principal that a partial payment on a debt takes the debt out of the operation of the statute of limitations." (ECF No. 31 at 12, n.5). But a partial payment on a time-barred debt does not save the debt from the statute of limitations. *Stimpson v. Midland Credit Management, Inc.*, 2018 WL 4643110, at *4 (D. Idaho Sept. 27, 2018) (applying Nevada law). This is because §11.200 requires that the payment be made upon an "existing contract"; the Supreme Court of Nevada has clarified that the term "existing contract" means "an existing [enforceable] contract and not a contract the enforcement of which has already been [barred] by the statute of limitations." *Riff v. Kowal*, 352 P.2d 819, 820 (Nev. 1960). So even if the Court were to construe AT&T's obligation to install its own power meter as a "debt" and an installment payment, it is still subject to being time-barred by the statute of limitations.

AT&T's reliance on §11.390 is also misguided. §11.390 states that "[n]o acknowledgment or promise shall be sufficient evidence of a new or continuing contract whereby to take the case out of the operation of this chapter, unless the same be contained in some writing signed by the party to be charged thereby, except as provided in NRS 11.200. NEV. REV. STAT. §11.390. AT&T asserts that this statute prevents RTC from arguing that the statute of limitations tolled because the unnamed AT&T representative's March 2001 promise to Rothe to install a separate power meter was not reduced to writing. (ECF No. 28 at 9–10). What AT&T ignores, however, is that at the time its representative purportedly made a promise to install a separate meter, AT&T was already under an obligation to install a separate meter pursuant to the written lease agreement. Had RTC discovered AT&T's breach in March 2001, it would have had a timely claim for breach of contract regardless of the representative's statement. §11.390 is a codification of the common law rule that

a promise to pay an indebtedness is binding on the promisor if the debt is still enforceable, or if it would be except for the presence of a statute of limitations. RESTATEMENT (SECOND) OF CONTRACTS §82 (AM. LAW INST. 1981); *Cass, Inc. v. Production Pattern and Foundry Co., Inc.*, 2017 WL 1128597, at *15 (D. Nev. Mar. 23, 2017). This rule is a method of reviving a debt after the statute of limitations period has passed; it does not, as AT&T appears to suggest, obviate a valid written promise from being enforced during the statutory period.[3] And as RTC has pointed out, AT&T cites no caselaw to support its position.

The resolution of whether RTC's breach of contract claim is time-barred, then, turns not on any statutory provision, but on the outcome of the discovery rule. After reviewing the available evidence, the Court determines that there are genuine issues of material fact as to whether RTC had actual notice of AT&T's breach and whether it exercised proper diligence in monitoring AT&T's compliance with the lease agreement. As to the former, there is no dispute that in March 2001, RTC learned (from AT&T) that its predecessor in interest had entered into an alternate arrangement with AT&T whereby AT&T would pay an average daily consumption rate. (ECF No. 28 at 6; ECF No. 31 at 6). But what is unclear is whether RTC had actual notice that AT&T had failed to install a separate, fully functional meter. A March 29, 2001 email from Gregg Koechlein (a representative of RTC's predecessor in interest) to RTC only reveals that AT&T had agreed to continue the previous payment arrangement, not that it had not installed a power meter. (ECF No. 28-1 at 84). This email is what prompted Rothe to contact an AT&T representative and insist that AT&T follow the original terms of their deal. (*Id*. at 39–40). In his deposition, Rothe testified that he communicated RTC's position to AT&T, who, according to Rothe, agreed to abide by the terms of the deal. (*Id*. at 40–41; ECF No. 31 at 6). Again, it is unclear whether RTC knew that AT&T had not installed a working power meter at the time of Rothe's phone conversation, and moreover, AT&T disputes the existence of the conversation in the first place. (ECF No. 28 at 6).

There is also an issue of material fact as to whether RTC and Rothe's conduct in monitoring AT&T's compliance following the phone conversation constituted "due diligence" as to place

---

[3] *See, e.g.,* RESTATEMENT (SECOND) OF CONTRACTS §82 cmt. b, illus. 1 (AM. LAW INST. 1981).

10

RTC under the protection of the discovery rule. *Bemis v. Estate of Bemis*, 967 P.2d 437, 440 (Nev. 1998). RTC has alleged that over the lifespan of the lease agreement, Rothe inspected the building's utility room "several times" and saw a power meter labeled "AT&T" that in his view, appeared to be working. (ECF No. 31 at 7). AT&T's own utility analyst, Susan Baze, stated that given the appearance of the meter, Rothe would have "no way of knowing" that the meter wasn't functional. (ECF No. 31-5 at 15–16). RTC has also argued that the method in which AT&T was drawing power for its communications facility (through the parking lot circuit) made it impossible for RTC to discover the conduct. (ECF No. 31 at 7). As before, AT&T contests the fact that RTC did anything at all to ensure AT&T's compliance with the lease agreement, let alone inspect the utility bills and utility room. (ECF No. 28 at 6). As the Ninth Circuit has stated, unless "uncontroverted evidence irrefutably demonstrates" that the plaintiff discovered or should have discovered the breach, whether or not it did so remains a question of fact to be determined by the trier of fact. *Nevada Power Co. v. Monsanto Co.*, 955 F.2d 1304, 1307–08 (9th Cir. 1992) (citing *Mosesian v. Peat, Marwick, Mitchell & Co.*, 727 F.2d 873, 877 (9th Cir. 1984)). Given that the parties dispute whether RTC exercised any diligence *at all*, it can hardly be said that the facts are "uncontroverted." It will be up to the trier of fact to determine whether RTC exercised reasonable diligence in monitoring AT&T's conduct. *See Nevada Power Co.*, 955 F.2d at 1308 ("Where the cause of action was belatedly discovered, the issue whether the plaintiff exercised reasonable diligence is a question of fact.") (quoting *Timmel v. Moss*, 803 F.2d 519, 521 (9th Cir. 1986)).

In sum, AT&T has failed to demonstrate that (1) there is a statutory bar to RTC's breach of contract claim, and (2) that there is no genuine issue of material fact as to when or how RTC discovered the breach. Therefore, the Court will deny AT&T's motion for summary judgment on RTC's breach of contract claim.

### 2. Claim Two – Good Faith and Fair Dealing

AT&T also requests summary judgment on RTC's second claim – a violation of the implied covenant of good faith and fair dealing – for the same reasons stated in the previous section. The Court will similarly deny AT&T's motion on this claim. All Nevada contracts impose upon the parties an implied covenant of good faith and fair dealing, which prohibits "arbitrary or

unfair acts by one party that work to the disadvantage of the other. *State Dep't of Transp. v. Eighth Judicial District Court in and for County of Clark*, 402 P.3d 677, 683 (Nev. 2017). Under Nevada law, a claim for a violation of the covenant is subject to a four-year statute of limitations. *Schumacher v. State Farm Fire & Cas. Co.*, 467 F. Supp.2d 1090, 1094–95 (D. Nev. 2006); Nev. Rev. Stat. §11.190(2)(C). RTC has premised its claim for a violation of the covenant on AT&T's failure to install a separate power meter and pay for its own electricity. (ECF No. 1-1 at 6–7). As the Court explained above, there are still genuine issues of material fact as to when RTC discovered AT&T's breach and whether RTC's conduct following March 2001 was sufficiently diligent. If the finder of fact determines that RTC had actual or constructive knowledge of AT&T's breach more than four years before RTC filed its complaint, it will be barred from seeking damages under a good faith and fair dealing theory.

### 3. Claim Three – Quantum Meruit

AT&T next argues that the Court should grant summary judgment on RTC's claim for quantum meruit because such a remedy is unavailable when, as here, there is a valid written contract. (ECF No. 28 at 13). AT&T does not, however, cite to any Nevada law to support its proposition. RTC counters by stating that it only plead quantum meruit as an alternative to its breach of contract claim. (ECF No. 31 at 22). Under Nevada law, quantum meruit serves a dual purpose. Quantum meruit first acts as a "gap-filler" to supply a missing term in a contract to create a contract implied-in-fact. *Certified Fire Prot. Inc. v. Precision Constr.*, 283 P.3d 250, 379–80 (Nev. 2012). In its second role, it provides a harmed party with appropriate restitution when that party is the victim of unjust enrichment. *Id.* at 380–81.

AT&T is mistaken that quantum meruit cannot be plead when an express contract exists. *See J.A. Jones Const. Co. v. Lehrer McGovern Bovis, Inc.*, 89 P.3d 1009, 1017 (Nev. 2004) (citing *Paterson v. Condos*, 28 P.2d 499, 500 (Nev. 1934) ("The contractor may ... base his action upon both the contract and upon a quantum meruit by setting up the former in one count, and the latter in another in his complaint.")). In *Topaz Mut. Co., Inc. v. Marsh*, the Nevada Supreme Court explained that "[a] plaintiff may assert several claims for relief and be awarded damages on different theories." 839 P.2d 606, 610 (Nev. 1992). Of course, a plaintiff cannot recover more in

damages than its total loss plus any punitive damages. *Id*. But it is not improper for RTC to plead quantum meruit in the alternative to breach of contract. Therefore, the Court will deny AT&T's motion for summary judgment on this claim.

### 4. Claim Four – Conversion

AT&T next argues for summary judgment on RTC's conversion claim. Under Nevada law, conversion is defined as a "distinct act of dominion wrongfully exerted over another's personal property in denial of, or inconsistent with his title rights." *Evans v. Dean Witter Reynolds, Inc.*, 5 P.3d 1043, 1048 (Nev. 2000) (quoting *Wantz v. Redfield*, 326 P.2d 413, 414 (Nev. 1958)). It is an act of general intent, which means that care, good faith, or a lack of knowledge will not act as excuses. *Id*. AT&T argues that RTC's conversion claim should be dismissed because conversion is a tort claim and it must be premised on something other than a breach of a contract. (ECF No. 28 at 14). RTC responds by asserting that its conversion claim is premised not on AT&T's failure to install a separate power meter, but rather on its usage of RTC's electricity without permission. (ECF No. 31 at 22). Whether conversion has occurred is generally a question of fact for the finder of fact. *Rebel Communications, LLC v. Virgin Valley Water Dist.*, 2015 WL 4172442, at *10 (D. Nev. July 9, 2015) (citing *Evans*, 5 P.3d at 1048).

The Court agrees with RTC. It is undisputed that AT&T did not install a separate power meter; instead, AT&T installed a meter that took its power from RTC's main meter. (ECF No. 34 at 4). AT&T does not attempt to argue that it had RTC's permission to use its electricity to power AT&T's own communications facilities. Nor does it deny that it did in fact use RTC's electricity to power its equipment. The evidence before the Court indicates that AT&T used RTC's power to run its communication facilities from the moment they were installed in the late 1990s until the installation of AT&T's separate meter in May 2017. (ECF No. 31 at 8, 10; ECF No. 31-15 at 14–15). But under Nevada law, conversion carries a three-year statute of limitations. *Shupe & Yost, Inc. v. Fallon Nat. Bank of Nevada*, 847 P.2d 720, 720–21 (Nev. 1993); NEV. REV. STAT. §11.190(3)(c). And the discovery rule also applies to conversion claims, with the claim beginning to accrue "no later than the time at which the injured party becomes aware of the taking." *Bemis v. Estate of Bemis*, 967 P.2d 437, 440 (Nev. 1998). Thus, like before, it will be up to the trier of

fact to determine when RTC's conversion claim began to accrue, which turns on when it discovered that AT&T was improperly siphoning its electricity.

### 5. Claim Five – Fraudulent Concealment

Lastly, AT&T requests summary judgment on RTC's final cause of action – fraudulent concealment under Nevada law. To prevail on a claim for fraudulent concealment, a plaintiff must prove that: (1) the defendant concealed or suppressed a material fact; (2) the defendant was under a duty to disclose the fact to the plaintiff; (3) the defendant intentionally concealed or suppressed the fact with the intent to defraud the plaintiff; (4) the plaintiff was unaware of the fact and would have acted differently if he had known of the concealed or suppressed fact; and (5) because of the concealment or suppression, the plaintiff suffered damages. *Peri & Sons Farms, Inc. v. Jain Irr., Inc.*, 933 F. Supp.2d 1279, 1292 (D. Nev. 2013) (citing *Nevada Power Co. v. Monsanto Co.*, 891 F. Supp. 1406, 1415 (D. Nev. 1995)). AT&T focuses its argument on the second requirement – that it was under a duty to disclose to RTC the fact that it had not installed a separate power meter. To trigger a duty to disclose a fact, Nevada requires that there be a fiduciary or a "special" relationship between the parties. *Id*. (citing *Dow Chem. Co. v. Mahlum*, 970 P.2d 98 (Nev. 1998)). AT&T argues that there was neither a fiduciary nor a special relationship between itself and RTC, and as such, RTC cannot legally meet the elements for a fraudulent concealment claim. (ECF No. 28 at 16).

Such instances of a "special relationship" between parties have been found in several situations, such as a real estate agent/vendor-buyer, insurer/insured, trustee/beneficiary, and attorney/client relationships. *Nevada Power Co. v. Monsanto Co.*, 891 F. Supp. 1406, 1416, n.3 (D. Nev. 1995) (collecting cases). In *Nevada Power Co.*, this Court found that no special relationship existed between a seller and purchaser of electrical equipment because the relationship was a "straightforward vendor-vendee relationship." *Id*. at 1417. The Court reached the same conclusion on the same basis in *Peri & Sons Farms, Inc. v. Jain Irr., Inc.*, 933 F. Supp.2d 1279, 1293–94 (D. Nev. 2013). On the other hand, this Court has previously denied a defendant's motion for summary judgment where the relationship between the parties amounted to an "arms' length real estate transaction." *Baroi v. Platinum Condominium Dev., LLC*, 2012 WL 2847919, at *8–9

(D. Nev. July 11, 2012). In *Baroi*, the plaintiffs had purchased several condominium units from the defendants but alleged that they had misrepresented how much money they (plaintiffs) could earn by renting out the units. *Id*. at *6. The Court determined that a reasonable fact finder could find that the defendants were liable for fraudulent concealment when their representatives told the plaintiffs that they could make their money back by renting the condominiums despite financial projections to the contrary. *Id*.

In this case, the Court finds that no special relationship exists between RTC and AT&T. RTC has not provided the Court with any authority in which a court has found a special relationship between a vendor and vendee, nor has the Court found any in its research. The situation at hand does not fall into any of the established categories, including the real estate agent and vendor relationship. RTC was not selling property to AT&T, but rather leasing a small space on the rooftop of a building it owned so that the latter could install telecommunications equipment. RTC does not attempt to argue that its relationship with AT&T falls within the purview of one of the established categories, but instead repeats its allegations against AT&T and makes conclusory statements that AT&T's conduct was "peculiarly within its knowledge and not within [RTC's] fair and reasonable reach." (ECF No. 31 at 27). This is little more than a restatement of the operative law and insufficient to demonstrate that it had a special relationship with AT&T.

Another important distinction that RTC overlooks is that in fraudulent concealment actions, the party with superior knowledge conceals that knowledge prior to the signing of the contract. *See, e.g., Baroi v. Platinum Condominium Dev., LLC,* 2012 WL 2847919, at *3 (D. Nev. July 11, 2012) (defendant's representatives misrepresented the rental value of condominium units during private showings to the plaintiffs prior to their sale); *Epperson v. Roloff*, 719 P.2d 799, 801 (Nev. 1986) (prior to the sale of a home, defendants told plaintiffs that the home had a solar heating system, but it did not); *N. Nevada Mobile Home Brokers v. Penrod*, 610 P.2d 724, 726 (Nev. 1980) (defendants claimed that a particular price for the sale of plaintiffs' mobile home was the highest price they could get, but it was not). This is not the case here, as RTC has not provided the Court with any evidence that AT&T entered into the contract with the intent to never install a separate power meter and to instead draw power from RTC's main meter. The Court is also highly doubtful

of RTC's argument because if RTC's interpretation of the law was correct, then every plaintiff in every breach of contract action would also have a claim for fraudulent misrepresentation when the defendant was aware that it was actively breaching the contract but remained silent. This is clearly not the purpose behind the tort of fraudulent concealment. *See, e.g.,* RESTATEMENT (SECOND) OF TORTS §550.

Because RTC cannot demonstrate that a special relationship existed between it and AT&T, it cannot establish one of the necessary elements of fraudulent concealment. Thus, the Court will grant AT&T summary judgment on this claim. *Peri & Sons Farms, Inc. v. Jain Irr., Inc.*, 933 F. Supp.2d 1279, 1293–94 (D. Nev. 2013).

### C. RTC's Motion for Partial Summary Judgment

The Court now briefly turns to RTC's motion, which requested summary judgment on its first two claims – breach of contract and a breach of the implied covenant of good faith and fair dealing. (ECF No. 29 at 3). Based on the Court's discussion of AT&T's motion for summary judgment, the Court will deny RTC's motion on the same grounds. The success of RTC's allegations turns on when the trier of fact finds that RTC had notice or should have had notice of AT&T's breach.

### IV. Conclusion

IT IS THEREFORE ORDERED that RTC's motion to file a sur-reply (ECF No. 36) is **GRANTED**.

IT IS FURTHER ORDERED that RTC's motion for summary judgment (ECF No. 29) is **DENIED**.

IT IS FURTHER ORDERED that AT&T's motion for summary judgment (ECF No. 28) is **DENIED** as to first four claims (breach of contract, breach of the implied covenant of good faith and fair dealing, quantum meruit, and conversion) of RTC's complaint.

IT IS FURTHER ORDERED that AT&T's motion for summary judgment (ECF No. 28) is **GRANTED** as to RTC's fifth claim, fraudulent concealment.

///

///

IT IS FURTHER ORDERED that the parties shall submit their proposed joint pretrial order pursuant to Local Rules 16-3 and 16-4 within sixty (60) days of the entry of this order.

IT IS SO ORDERED.

DATED this 7th day of February, 2019.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE